639 So.2d 41 (1994)
UTICA MUTUAL INSURANCE COMPANY, Appellant,
v.
PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, Appellee.
No. 93-1336.
District Court of Appeal of Florida, Fifth District.
April 15, 1994.
Rehearing Denied June 23, 1994.
*42 John A. Shughart, Jr. and Clifford D. Edelston of Shughart & Associates, Orlando, for appellant.
Stephen M. Bull and Bryan L. Capps of Bull and Associates, P.A., Orlando, for appellee.
COBB, Judge.
This appeal involves a dispute between two insurance carriers as to the extent of their respective coverages of their insureds, herein referred to collectively as Crane,[1] pursuant to policies relating to the errors and omissions of the latter acting as an insurance broker. Utica Mutual Insurance Company (Utica) issued the primary policy which covered $500,000.00 per claim and was limited to $1,500,000.00 aggregate, subject to a $5,000.00 deductible per claim. The insurance policy did not define the word "claim." Pennsylvania National Mutual Casualty Insurance Company (Penn National) issued an umbrella policy with a limit of $1,000,000.00 in excess of Utica's limits.
Travelers Indemnity Company was a surety company that issued its surety bonds through independent agents such as Crane. Crane, as agent, obtained payment and performance surety bonds from Travelers for a client known as CM Systems, Inc. (CMS), a commercial general contractor. Crane was required to provide underwriting information to Travelers about CMS, such as the financial status of the company. In 1985 Crane learned that Michael Scarfia and Max Mitchell, the president and accountant of CMS, had purchased a mining company called Terramar. Upon Scarfia's request, Crane withheld this information from Travelers. Crane also learned that CMS had leased mining equipment that it subleased to Terramar. When a Travelers representative asked Scarfia about certain UCC filings on equipment, Scarfia falsely represented that the equipment was new pickup trucks when it actually consisted of mining equipment.
During 1985 and 1986, Travelers wrote at least 64 bonds covering 52 CMS projects. Fourteen of these bonds, seven payment bonds and seven performance bonds, were written for seven projects wherein CMS, following the bankruptcy of Terramar and itself, defaulted. This caused Travelers to honor its surety obligation on those seven projects. Travelers maintained a separate claim file number for each defaulted project.
When Travelers learned that Crane had knowingly withheld information regarding the questionable investments of CMS and its president and accountant, it filed suit against Crane for the loss on each of the seven projects, an aggregate figure exceeding $4,700,000.00. Utica and Penn National, although in dispute between themselves as to their respective liabilities as the insurers of Crane, were able to settle the action by Travelers for $1,250,000.00. They agreed to each pay one-half. Penn National contributed $625,000.00, Utica contributed $495,000.00 on its own behalf and $125,000.00 pursuant to a loan agreement with Crane, and Crane contributed $5,000.00 (one deductible under its policy with Utica). In the loan agreement, Crane assigned Utica any right of action that Crane had against Penn National under the umbrella policy.
It is important to note that at the time of the settlement with Travelers, which was clearly in the best interest of the insured, both Utica and Penn National agreed to reserve their dispute as to the number of claims involved, which determined their respective coverage liabilities, for subsequent judicial resolution. It should also be noted that there was no evidence adduced at any time that the settlement value in respect to any particular project was greater than *43 $500,000.00, the "per claim" limit in the Utica policy.
Penn National then filed suit against Utica and Utica counterclaimed, each alleging various theories of breach of contract and subrogation. In fact, they were simply seeking a declaratory judgment of their respective obligations under the insurance policies with Crane, as they had agreed to do at the time of their settlement with Travelers. The ultimate issue to be decided by the trial court was whether Travelers settled one claim, or more than one claim, against Crane, as the term "claim" was used in the Utica policy.
The trial court denied motions for summary judgment and submitted the issue to a jury, which found that Travelers settled more than one claim against Crane and returned a verdict in favor of Penn National against Utica for $625,000.00, the amount that Penn National contributed to the settlement. The trial court then awarded Penn National attorney's fees pursuant to section 627.428(1), Florida Statutes (1993), which provides:
Upon the rendition of a judgment or decree by any of the courts of this state against an insurer and in favor of any named or omnibus insured or the named beneficiary under a policy or contract executed by the insurer, the trial court or, in the event of an appeal in which the insured or beneficiary prevails, the appellate court shall adjudge or decree against the insurer and in favor of the insured or beneficiary a reasonable sum as fees or compensation for the insured's or beneficiary's attorney prosecuting the suit in which the recovery is had.
Utica has appealed from the judgment entered below, contending the trial court erred in various respects: in denying its motions for summary judgment, directed verdict, and new trial; in admitting testimony of one Andrew Beverly; in utilizing a confusing verdict form; in granting Penn National's motion for attorney's fees; and in granting post-judgment interest on an award that included prejudgment interest.
In regard to the principal issue on appeal  the number of claims covered by the Utica policy  we concur with the result reached by the trial court, although it appears the issue was one of law to be determined by the court rather than one of fact for the jury. The ambiguous word "claim" was not defined by the Utica policy, and therefore must be construed against the drafter, Utica, and in favor of greater coverage. See Prudential Property and Casualty Ins. Co. v. Swindal, 622 So.2d 467, 470 (Fla. 1993); State Farm Mut. Auto. Ins. Co. v. Pridgen, 498 So.2d 1245, 1248 (Fla. 1986). Utica's construction of its policy would afford Crane only $500,000.00 primary coverage less a $5,000.00 deductible, plus the $1,000,000.00 excess coverage by Penn National. The trial court's conclusion that there were multiple claims (presumably seven) afforded $1,500,000.00 primary coverage (less any applicable deductible up to $35,000.00) plus the $1,000,000.00 excess coverage. Clearly, the trial court's interpretation afforded the greater coverage. There was a sufficient evidentiary basis to support the trial court's conclusions since there were seven separate projects involved in the action by Travelers and separate bonds issued for those projects, and the defaults occurred at separate points in time.
We find no error in the trial court's discretionary decision to admit the expert testimony of Andrew Beverly despite late notice by Penn National. See Binger v. King Pest Control, 401 So.2d 1310, 1313 (Fla. 1981). Utica was afforded the opportunity to depose Beverly the night before trial and declined to do so. Nor can we find any merit in Utica's contention that the verdict form confused the jury since we do not believe the jury should have decided the central issue in the first place.
We find that the trial court erred in awarding an attorney's fee to Penn National. Under the terms of section 627.428(1), the latter does not qualify as "any named or omnibus insured or the named beneficiary under a policy or contract executed by the insurer." Since the true nature of this action was, or should have been, one for declaratory relief solely between two insurers rather than a subrogation action, there was no basis for the attorney's fee award.
*44 The last issue raised on appeal is whether or not post-judgment interest accrues in regard to that portion of the final judgment that represents prejudgment interest. In our opinion in Peavy v. Dyer, 605 So.2d 1330 (Fla. 5th DCA 1992), we held that it does. Therein, we said:
In Argonaut Ins. Co. v. May Plumbing Co., 474 So.2d 212, 214-215 (Fla. 1985), our supreme court determined that prejudgment interest is simply an element of pecuniary damages. Under this loss theory of damage, the failure of the defendant to surrender monies it owed to the plaintiff was itself a wrongful deprivation of the plaintiff's property, which the final judgment restores to the plaintiff. Once this element of damages is awarded in the final judgment, prejudgment interest, like all other elements of damage, becomes part of a single total sum adjudged to be due and owing. See Phillips v. Parrish, 585 So.2d 1038 (Fla. 1st DCA 1991). The amount awarded for prejudgment interest, like all other components of the "judgment", automatically bears interest as provided by section 55.03, Florida Statutes.
Our conclusion in Peavy is at odds with our sister courts[2] and with Florida Rule of Civil Procedure Form 1.988 (Judgment After Default) amended by the Florida Supreme Court in 1992. See In re Amendments to the Florida Rules of Civil Procedure, 604 So.2d 1110, 1210 (Fla. 1992). We adhere to our position as stated in Peavy, but, in view of the conflict between appellate courts and between the Florida Supreme Court's language in Argonaut and its amendment of Form 1.988 in 1992, we certify to the Florida Supreme Court the question of whether or not post-judgment interest accrues in regard to that portion of a final judgment that represents prejudgment interest.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
DAUKSCH, J., concurs.
GRIFFIN, J., concurs in part and dissents in part, with opinion.
GRIFFIN, Judge, concurring in part and dissenting in part.
I concur in the opinion of the majority except in its conclusion that Utica is liable to reimburse Pennsylvania National for its $625,000 contribution to the settlement with Travelers. The majority holds that Travelers made multiple claims against Newman-Crane and Huston Crane [Crane], Utica and Pennsylvania National's insureds, thus making Utica liable for the entire settlement. In essence, the majority opinion concludes that because the word "claim" is not defined in the Utica policy and because this case presents a fact pattern involving something other than a single act of negligence by the insured on a specific date giving rise to an exact amount of loss to a single claimant, making the question of the number of claims uncertain, the appropriate solution is to apply a rule of construction that "maximizes coverage" to the insured. This is so despite the fact that the parties to this insurance contract, Utica and Crane, both agree that they intended their insurance contract to treat such a loss as a single claim. Apparently, the insured, Crane, preferred to "maximize" indemnity by minimizing his deductible rather than "maximize" coverage, which he didn't need.
I dissent because I think there is an objective legal answer to the question of how many claims were made by Travelers against Crane. The issue is not so arcane or confounding that it has to be answered by a rule of construction. Also, it bothers me that given the same set of facts on liability, the answer to the question of the number of claims should depend on the amount of coverage. Suppose instead of Crane's $5,000 per claim deductible, the deductible were $150,000 per claim. Applying the majority's rule of construction, the number of claims would switch from seven to one.
The fact that there are several possible answers to the question of how many claims *45 Travelers made against Crane does not mean there is not a correct one capable of identification by the trial court based on what are essentially undisputed facts. Travelers claimed that in March 1985 its agent, Crane, learned adverse financial information about CM Systems, Inc. ["CM Systems"] that he failed to disclose, as he should have, the moment he learned it. As the result of Crane's breach of duty, Travelers issued a total of 64 bonds of various types to CM Systems that Travelers claimed it would not have issued had it known the true facts. Apparently, there were defaults on several CM Systems projects, resulting in 173 payment bond claims against Travelers by suppliers and subcontractors and seven performance bond claims by the owners of seven projects. These monies were paid out by Travelers over a two year period, from 1986 through 1988. Travelers claimed a multimillion dollar loss as the result of its agent's omission, consisting of the sums expended in payment of all 180 claims, consulting fees to administer the CM Systems losses, and attorney's fees. The net total amount of Travelers' loss is what it asserted as a claim against Crane  all arising out of a single, though continuing, act of misfeasance by Crane.
It is doubtful that any definition of "claim" that Utica might have included in its "Insurance Agents' and Brokers' Errors and Omissions Policy" would have shed any light on the number of claims made by Travelers in this context. It is important, however, that the Utica policy issued to Crane that we are attempting to interpret was written on a "claims made" basis. It provided in pertinent part:
INSURING AGREEMENTS
1. Insuring Clause: To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages by reason of liability arising out of any negligent act, error or omission, whenever or wherever committed, or alleged to have been committed by the insured or any person employed by the insured in conduct of the named insured's business as Insurance Agents, Insurance Brokers or General Insurance Agents, which shall include the related activities connected therewith of notarizing (provided a specific premium charge is indicated on the declarations page hereof) appraising real estate and claims adjusting with respect to policies written or placed through the insured premium financing, counselling as respects insurance programs (including insurance advice rendered as a public service to local organizations), the sale of mutual funds, and servicing of the insurance business of others, provided however, that:

(a) a claim resulting from such act or error or omission is first made against the insured during the policy period as defined herein. [Emphasis added].
The policy period was January 15, 1986 to January 15, 1987. Travelers began issuing bonds to CM Systems in 1983. Crane first learned the adverse financial information about CM Systems in March 1985. The CM Systems' project bonds that resulted in losses and on which Travelers filed suit were issued during the period June through December 1985.[1] Travelers suffered losses on bonds it issued before March 1985 but made no claim for these losses. Also, Travelers suffered no loss in connection with some of the CM Systems bonds written after Crane learned of the adverse financial information. The bonds that did not result in a loss yielded a substantial premium profit[2] to Travelers that it would not have had under Travelers' own theory if Crane had conformed to his duty of disclosure. In effect, there was an overall net loss suffered by Travelers that it sought to attribute to Crane's misfeasance.
During the course of Traveler's investigation of the CM Systems loss in September 1986, Crane voluntarily gave a sworn statement to Travelers. After Crane testified about what he knew, when he knew it and his *46 failure to inform Travelers, counsel for Travelers suggested to Crane that he should put his E & O carrier on notice. Crane advised Utica of a "possible E & O claim" by letter dated September 30, 1986. That notice is the claim triggering coverage during the January 1986  January 1987 policy term. Thereafter, on October 24, 1986, Travelers' counsel wrote a letter to Crane placing him formally on notice of Travelers' intention to "assert a claim" against Crane's carrier. Travelers' counsel simultaneously informed Utica in writing of "a potential claim." As described by Travelers' counsel, the "claim" was as follows:
Prior to the issuance of the aforesaid surety bonds, the above named individual and entities specifically obtained various information concerning the activities of C.M. Systems, Inc. and related individuals, that materially increased the risk of loss to The Travelers as to the subsequent issuance of these bonds. It is our position that your insured negligently failed to disclose this information to The Travelers, when it had a clear legal duty to do so. Furthermore, had this information been so disclosed, The Travelers would not have executed the various, subsequent surety bonds. As of this date, C.M. Systems, Inc. has defaulted under its obligations relating to these various surety bonds, which has resulted in current and anticipated losses to The Travelers Indemnity Company of an amount probably in excess of $5,000,000.
When Travelers subsequently filed suit against Crane, the complaint contained fourteen counts. At trial, counsel for Travelers acknowledged that the purpose of the multiple counts was to try to increase coverage by creating multiple claims. Nevertheless, the core allegation for all counts was very specific:
13. On or about March of 1985, defendant, NEWMAN-CRANE, was advised by principals of C.M. SYSTEMS, that they had entered into certain personal and/or corporate investments which would materially affect and impact their financial condition, as well as that of the corporation. The information imparted to Defendant, NEWMAN-CRANE, was the type of information that Plaintiff had requested from Defendant, NEWMAN-CRANE and said Defendant had agreed to obtain for Plaintiff.
14. Defendant, NEWMAN-CRANE, contrary to the terms and conditions of its agreement with Plaintiff, and in material breach thereof, failed to advise Plaintiff of said investments.
15. As a direct and proximate result of the aforementioned material breach, Plaintiff continued to issue construction bonds in favor of C.M. SYSTEMS.
* * * * * *
20. TRAVELERS would not have undertaken to issue the subject bonds had the true financial status and condition of C.M. Systems, known to exist by Defendant, NEWMAN-CRANE, had been made known to TRAVELERS.
The record also reflects that as late as December 6, 1990, after monitoring Travelers' suit against Crane for three years, Pennsylvania National itself considered that the total available coverage under both policies to be $1.5 million (i.e. $500,000 from Utica and $1 million under its umbrella policy).
The most analogous case  indeed the only analogous case cited by the parties  is Pioneer National Title Insurance Co. v. Andrews, 652 F.2d 439 (5th Cir.1981). In that case, a legal malpractice action was brought against an attorney hired to search the title of a tract of land. He did so negligently and thereafter issued three letters of certification over several months incorrectly describing the state of title. The court viewed the attorney's negligence as a single, continuing act and refused to create coverage for multiple "claims." Although this case is not entirely on point, its reasoning is instructive. In the present case, the duty to disclose arose when the adverse financial information was learned; if disclosed at the outset, it would have prevented Travelers' loss. The fact that there was a continuing failure to disclose every day, including those days when CM Systems applied for new bonds, does not create a new claim for each failure to disclose. As reflected in the record, Webster's Ninth New Collegiate Dictionary defines a "claim" as "a demand for something *47 due or believed to be due (insurance)." It seems apparent that what Travelers made was "a claim" for its net loss allegedly caused by Crane's breach of duty as agent.
NOTES
[1] The insureds were: Osceola Management and Financial Services, Inc.; Newman-Crane and Associates Ins., Inc.; and Huston Crane, individually.
[2] See, e.g., S & E Contractors, Inc. v. City of Tampa, 629 So.2d 883 (Fla. 2d DCA 1993); Central Constructors, Inc. v. Spectrum Contracting Co., 621 So.2d 526, 527 (Fla. 4th DCA 1993); Perez Sandoval v. Banco de Commercio, S.A., C.A., 582 So.2d 179 (Fla. 3d DCA 1991); LaFaye v. Presser, 554 So.2d 610 (Fla. 1st DCA 1989).
[1] They suffered losses on three bonds issued before Crane learned the adverse financial information he failed to disclose.
[2] The record shows that CM Systems bonds generated in excess of $100,000 in premiums to Travelers in the second quarter of 1985 alone.